UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY LEE KING,<br><br>      Petitioner,<br><br>   vs.<br><br>DAVE DAVEY,<br><br>      Respondent. | No. 2:16-cv-1464-WBS-EFB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302. Petitioner challenges a judgment of conviction entered against him on February 21, 2014 in the Sacramento County Superior Court on a charge of first degree murder pursuant to Pen. Code § 187. The jury also found true a firearm enhancement pursuant to Pen. Code § 12022.53, subds (b), (c), (d). He seeks federal habeas relief on the following grounds: (1) insufficient evidence supported a lying in wait jury instruction and the relevant instruction given by the trial court was incomplete; (2) the trial court erred in instructing the jury on the concept of pretextual self-defense; (3) trial counsel was constitutionally ineffective by failing to object to an instruction which did not inform the jury that provocation could lessen a murder from first to second degree by negating premeditation, deliberation, or both; (4) the evidence supporting his conviction is "legally insufficient;" and (5) the prosecutor committed misconduct by presenting the jury with misleading information. Upon careful

consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.[1]

BACKGROUND

I.      Prosecution Case

    A.      The Crime Scene

On December 9, 2012, at approximately 5:00 p.m., Sacramento County Sheriff's deputies responded to a shooting in rural Herald. The shooting occurred at a trailer residence which sat on a ten acre parcel of land and which belonged to petitioner's mother, Terri Ginochio. Ginochio lived in the trailer with petitioner and her brother, Willis Griffin.

The deputies arrived at the trailer to find Griffin lying dead in the driveway with a bullet wound to his chest. Petitioner exited the trailer when the deputies arrived. He told them that he had been asleep on the couch when he heard a gunshot. Petitioner claimed that, after hearing the shot, he looked out the front window of the trailer and saw a gray pickup truck driving away.

A search for bullets and casings by the county crime scene investigation unit was initially unsuccessful. A black, long rifle gun case was found in the residence living room, however. A canine search of the property the next day uncovered a rifle hidden amongst leaves and tree limbs. The rifle's firing chamber contained a spent shell casing. Deputies also found a box of ammunition on the property.

    B.      Testimony of Friends and Neighbors

A deputy canvassed the area and spoke with the neighbors, Donald and Patricia Bell. The Bells stated that they had heard a loud gunshot emanating from Ginochio's trailer at approximately 4:15 in the afternoon. Donald Bell stated that he had heard gunshots from that area in the past, but noted that they had typically come from the back of the neighboring trailer rather than the front. He was not sure who had been doing the shooting on those occasions. Donald Bell stated that he had not seen any unusual vehicles in the area after hearing the gunshot.

---

[1] Petitioner has also filed a motion to stay. ECF No. 55. As addressed in separate findings and recommendations, that motion should be denied. ECF No. 62. Those recommendations were adopted by the district judge. ECF No. 65.

Anthony McKissick stated that, at 8:00 a.m. on December 9, 2012, he and Griffin were travelling to the Ginochio residence to pick up a car. They encountered Ginochio on their way and she appeared frantic and upset. She claimed that she had had an argument with petitioner and he had threatened her with a knife. Ginochio warned Griffin not to go to the residence, telling him that petitioner would "do something to him." McKissick stated that Griffin and Ginochio then began arguing amongst themselves. Ginochio accused Griffin of involvement with petitioner's ex-girlfriend – a woman named Crystal - and going to a motel with her. She stated her intention to get a restraining order against both Griffin and petitioner. Eventually McKissick and Griffin went to Ginochio's residence, loaded the car onto a trailer, and left. Petitioner did not come outside at that time.

McKissick also testified that, approximately a week before the day of the shooting, he had been at Ginochio's trailer. While there, petitioner had ranted about Griffin being involved with Crystal. Petitioner stated his intention to "whip" Griffin, but that he could not do so while his mother (Ginochio) was present because she would call the police.

Anthony Barnes saw Griffin in the hours before his death. Griffin assisted Barnes in finding his lost dog. Then, the two men stayed at Barnes' home for approximately one and a half hours. Griffin eventually left on his motorcycle, but not before telling Barnes that he was on his way to confront petitioner about leaving Ginochio's residence.

C.     Testimony of Loretta Turpen

Loretta Turpen was in an off and on relationship with petitioner from January 2010 to December 2012. The two had a child together. Turpen testified that, during their relationship, petitioner was verbally and physically abusive towards her. She stated that she took medicine to petitioner the day before Griffin was killed. Griffin pulled into the driveway while she was there. Turpen stated that petitioner became agitated at his uncle's arrival, muttered "something about killing his uncle," and retrieved a rifle from his bedroom. She described it as a black rifle with a scope.

/////

/////

3

Turpen stated that she told petitioner that "no one needs to die over petty shit." Petitioner replied that "no one's going to die right now" and put the rifle in his mother's bedroom. Turpen then left.

D. Forensic Evidence

The autopsy on Griffin revealed that he had been killed by a high velocity rifle shot to the chest. The wound rendered his heart incapable of pumping blood and, consequently, he died within thirty seconds of being shot. The autopsy found no indication that CPR had been performed.

Investigators tested the rifle found on the property. Gunshot powder particles were found on the jacket Griffin was wearing at the time of his death. The tests indicated that Griffin had been shot from a distance of about ten feet. Gunshot residue testing detect particles on petitioner's left hand.

E. Detective Interviews

Detectives interviewed Ginochio twice on the evening of December 9, 2012. During the initial interview, Ginochio did not mention any issues she had with petitioner and stated only that he had seemed stressed lately. During the second interview, however, Ginochio acknowledged that petitioner was disrespectful of her and often said hurtful things toward her. She noted that Griffin had confronted petitioner about his treatment of her. Ginochio claimed that the situation had reached the point where she and Griffin were contemplating calling the police for help with petitioner. In a third interview with detectives on December 12, after petitioner had been arrested, Ginochio admitted that petitioner had once physically assaulted Griffin.

II. Defense Case

Petitioner testified at trial. He admitted three prior convictions – two car thefts (one is 2001 and another in 2004) and evading arrest in 2012.

Petitioner stated that, the night before the shooting, he had overheard Griffin tell Ginochio that he would kick petitioner out of the house the next day. On the morning of December 9, 2012, petitioner told Ginochio that she needed to take him to a job interview. When it appeared she would not do so, he threatened to stab the tires of her car.

Petitioner stayed home, took antibiotics, and fell asleep. That afternoon, he heard Griffin arrive on his motorcycle and believed his uncle had come to kick him out. Petitioner testified that he was scared of his uncle and that he had done "pretty mean things to people" in the past. He took the rifle from beneath his mother's bed, believing Griffin would not attack him physically if he saw the gun. Petitioner claimed that he did not know the rifle was loaded.

Petitioner confronted his uncle outside and Griffin asked whether he intended to shoot him. Griffin got off his motorcycle and ran at the petitioner. Petitioner yelled at his uncle to stop. Then, petitioner "pulled the gun up and it just went off." He claimed that he did not aim or remember having his finger on the trigger. Petitioner hid the rifle in some bushes behind the trailer and dialed 911. He testified that he lied to the responding deputies because he was scared.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.     Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

/////

5

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.     "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

B.     "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. Williams, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Id. at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply

controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[2] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[3] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[4] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[4] *Faretta v. California*, 422 U.S. 806 (1975).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 182.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Richter*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Richter*, 562 U.S. at 101-102.

C.     "Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

/////

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it.  *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004).  Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2).  *Id.* at 1001; *accord Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding.  *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002)  (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards.  *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc).  There is no single prescribed order in which these two inquiries must be conducted.  *Id.* at
/////

1  736 37.  The AEDPA does not require the federal habeas court to adopt any one methodology.

2  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

3  In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap.

4  Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard

5  will often simultaneously constitute a holding that the [substantive standard for habeas relief] is

6  satisfied as well, so no second inquiry will be necessary."  *Frantz*, 533 F.3d at 736.  In such cases,

7  relief may be granted without further proceedings.  *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062,

8  1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion

9  that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321

10  F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure

11  to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and

12  granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1)

13  unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at

14  capital sentencing, and granting penalty phase relief).

15  In other cases, a petitioner's entitlement to relief will turn on legal or factual questions

16  beyond the scope of the § 2254(d) analysis.  In such cases, the substantive claim(s) must be

17  separately evaluated under a de novo standard.  *Frantz*, 533 F.3d at 737.  If the facts are in dispute

18  or the existence of constitutional error depends on facts outside the existing record, an evidentiary

19  hearing may be necessary.  *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary

20  hearing after finding § 2254(d) satisfied).

21  <u>DISCUSSION</u>

22  I.  <u>Lying in Wait Claim</u>

23  In his first claim, petitioner argues that no substantial evidence supported a lying in wait

24  instruction and that the instruction given by the trial court was incomplete.

25  A.  <u>Applicable Legal Standards</u>

26  The formulation of jury instructions is a question of state law and generally non-

27  cognizable in federal habeas proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A

28  petitioner may obtain federal habeas relief for an erroneous state court jury instruction only where

"the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id*. at 72-73. Jury instructions should be evaluated in the "total context of events at trial" to determine whether a due process violation occurred. *United States v. Frady*, 456 U.S. 152, 169 (1982).

### B. The State Court's Ruling

The state court of appeal rejected this claim in a reasoned decision:

> Defendant contends no substantial evidence supported a lying-in-wait instruction and that the instruction that was given was incomplete. We disagree.
>
> The jury was instructed on premeditated murder and lying-in-wait murder, and the People argued the evidence supported each theory. The prosecutor's argument about lying in wait made the point that it was the equivalent of premeditation and deliberation. She emphasized that defendant had threatened to shoot Griffin the day before, but needed to wait for a better opportunity, presumably when his mother was absent. When Griffin arrived the next day, after defendant's mother had left, defendant took the opportunity to approach him with a rifle and take him unawares. Defense counsel argued there was no lying in wait, or ambush, because defendant openly walked 75 feet from the residence towards Griffin and shot him from 10 feet away.
>
> A. *Sufficiency of the Evidence*
>
> Defendant first contends that the record does not support a murder under a lying-in-wait theory, because defendant did not shoot from cover. No such requirement inheres in the lying-in-wait doctrine. Instead, as the jury was instructed, "A person can conceal his or her purpose even if the person killed is aware of the person's physical presence." Indeed, defendant concedes that a traditional ambush is not required, and that acting insidiously qualifies, pursuant to Supreme Court authority (*see People v. Stevens* (2007) 41 Cal.4th 182, 202 [lying-in-wait special circumstance] ), as does an attack performed "in a purposeful manner that required stealth and maneuvering to gain a position of advantage over the" victim (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1074).
>
> Although many cases cited by defendant to illustrate lying-in-wait murder involve ambush from cover or attacks on sleeping victims, these cases do not limit the ambit of lying-in-wait murder. The jury could find that defendant surprised his uncle by shooting him as Griffin approached defendant to talk, unaware that defendant intended to shoot him at close range instead of having a civil discussion. The fact that defendant was armed would not necessarily

alert Griffin to any danger, as even defendant claimed great affection for his uncle. The jury could well find that defendant managed to get within easily lethal range by concealing his murderous purpose.

B. *Instructional Claim*

Defendant claims the pattern first degree murder instruction, CALCRIM No. 521, does not require the jury to find that the act of lying-in-wait is the means of the killing. He posits we are likely to reject the claim based on precedent, but seeks to preserve it for review in the Supreme Court.

The pattern instruction as given in this case provided in relevant part:

> "The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if:

> "1. He concealed his purpose from the person killed;

> "2 He waited and watched for an opportunity to act;

> "AND

> "3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

> "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.

> "A person can conceal his or her purpose even if the person killed is aware of the person's physical presence."

As indicated by the penultimate paragraph just quoted, a lying-in-wait finding equates to a finding of deliberation or premeditation, as the prosecutor argued.

Defendant focuses on the first quoted sentence, to the effect the "the defendant murdered while lying in wait or immediately thereafter." (Italics added.) He contends the word "while" removes any necessary causal connection between his actions and the killing and supplants it with a purely *temporal* one.

> "In reviewing claims of instructional error, we look to whether the defendant has shown a reasonable likelihood that the jury, considering the instruction complained of in the context of the instructions as a whole and not in isolation, understood that instruction in a manner that violated his constitutional rights. [Citations.] We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129; cf.

12

*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1413 [noting counsel was "[e]ngaging in the proscribed hypertechnical parsing of instructions [citations] rather than determining the reasonably likely interpretation given them by reasonable jurors"].)

Although the beginning of the instruction refers to a killing "while" lying in wait or immediately thereafter, the instruction then lists three elements that must be proven beyond a reasonable doubt to establish such a killing: that the defendant (1) "concealed his purpose," (2) "waited and watched for an opportunity to act," and (3) "from a position of advantage ... intended to and did make a surprise attack on the person killed."

We agree with the People that these elements in combination, and in particular the third element, require that the act of lying in wait must be the mechanism by which the killing is achieved, that is, it must *cause* the killing. The defendant must intend to and "*make a surprise attack* on the person killed." (Italics added.) This requires that the defendant's actions of concealment of person or purpose or both affect the killing. The instruction does not permit a jury to find a lying-in-wait murder simply because a defendant concealed himself or his purpose at some point prior to or during the commission of the killing. Thus a mere temporal connection between the defendant's actions and the killing will not suffice to prove lying in wait under the pattern instruction.

*People v. King*, 2015 WL 3417430, at *4–5 (Cal.App. 3 Dist., 2015). Petitioner next raised these claims in a petition for review to the California Supreme Court (Lodg. Doc. No. 12) which was summarily denied. Lodg. Doc. No. 13.

C.    Analysis

The court of appeal found that there was sufficient evidence to support the lying in wait instruction. This determination was not unreasonable. Loretta Turpen testified that, the day before Griffin was killed, petitioner retrieved a rifle and made statements about wanting to act against his uncle. Lodg. Doc. No. 4 (Reporter's Transcript Vol. I) at 158-160. Anthony McKissick testified that, approximately a week prior to the incident, petitioner had made statements in his presence about wanting to hurt his uncle, but that he could not do it while Ginochio was around. *Id.* at 398. It was undisputed that the Griffin and petitioner were alone at the residence in the day in question. It was also undisputed that petitioner exited the trailer holding the rifle. Both the prosecution and defense theories of the case agreed that Griffin, even after seeing petitioner leave the trailer with the rifle, did not believe his nephew was prepared to

13

shoot him. Lodg. Doc. No. 5 (Reporter's Transcript Vol. II) at 1025. Finally, a criminalist testified that the shot that killed Griffin was fired from close range – between seven and fifteen feet from the victim. *Id.* at 435. Thus there was sufficient evidence to support the prosecution's lying in wait theory. Specifically, the evidence was sufficient to allow the jury to conclude that: (1) petitioner waited for the optimal time to confront and kill his uncle; (2) that petitioner concealed his true purpose until this optimal time; and (3) on the day in question petitioner approached within ten feet of Griffin and killed his unsuspecting uncle with a single shot to the chest. The fact that petitioner posited an alternate scenario by way of his own testimony does not automatically render the evidence supporting the lying in wait instruction inadequate.

As noted above, petitioner also raised a separate, but related claim – that the lying in wait instruction (CALCRIM No. 521) is deficient insofar as it does not require that lying in wait be the means by which the murder is perpetrated. This is purely a question of state law and, as noted *supra*, the court of appeal rejected this claim. This court is bound by that determination. *See Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) (it is undisputed that a "state court has the last word on the interpretation of state law"); *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003) (federal habeas court is bound by state's interpretation of its own laws).

II.     Self Defense Claim

Next, petitioner claims that the trial court erred when it gave the jury a pretextual self-defense instruction.

A.     Applicable Legal Standards

The standards regarding allegedly erroneous jury instructions, articulated in the foregoing section regarding petitioner's lying in wait claims, also apply here.

B.     The State Court's Decision

The court of appeal rejected this claim in a reasoned decision:

> Defendant contends the trial court should not have instructed the jury on the concept of pretextual self-defense. He concedes he did not object to this instruction in the trial court, but contends we should review his claim for various reasons. We elect to address the claim on the merits, and reject the claim of error.

/////

14

/////

### A. *Background*

The trial court gave the pattern CALCRIM instructions on self-defense and imperfect self-defense. These instructions required the jury, before returning a murder verdict, to find that the People had proven beyond a reasonable doubt that defendant had not acted to defend himself, whether defendant's belief in the need to do so was objectively reasonable or not. As to each defense, the jury was instructed to consider defendant's knowledge of Griffin's prior threatening or harmful acts in evaluating defendant's belief. As to regular self-defense, the jury was instructed defendant could stand his ground.

The trial court also gave CALCRIM No. 3472, as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Defense counsel argued in part that because of Griffin's size, violent past, and his sudden lunge towards defendant, defendant actually believed in the need to employ deadly force to defend himself. During rebuttal, the prosecutor argued, "A person doesn't have the right to self-defense if he provokes the fight or [acts] with an intent to create an excuse to use force. Well, I'm going to go out there with this rifle, when Willis sees it [and] says, what are you going to do, shoot me, then it's going to be okay that I do. That's not the way the law works."

### B. *Analysis*

To illustrate the concept of pretextual self-defense, counsel cites an unforgettable scene from *Shane*, where Jack Palance's character—a highly experienced gunfighter—goads Elisha Cook, Jr.'s character—an ordinary "sodbuster"—into reaching for his revolver, whereupon Palance's character shoots him down, having planned the entire scenario to absolve himself of liability, because he did not draw first. But, Hollywood notwithstanding—and regardless of whether the film correctly conveyed the extant law in 19th Century Wyoming—our Supreme Court has held that "[s]elf-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance, or fault, to create a real or apparent necessity for killing." (*People v. Hecker* (1895) 109 Cal. 451, 462.)

Defendant contends "nothing remotely similar" happened in this case. We disagree. The jury could plausibly find that defendant carried the rifle with him to goad Griffin into making a threatening move. Defendant's own testimony shows that after Griffin saw the gun, he in effect scoffed at it, taunting defendant by asking if he was going to "fucking shoot" Griffin. Then, when Griffin got off the motorcycle, according to defendant, Griffin indeed rushed towards defendant, whereupon, in defendant's version, the rifle discharged as he brought it up defensively. The very fact he greeted his uncle with a rifle in hand could be viewed by the jury as provocation by

15

defendant, because the jury was free to disbelieve defendant's testimony that he held the rifle in order to ensure a peaceful dialogue with Griffin.

Accordingly, contrary to defendant's view, substantial evidence supported the instruction, and therefore the trial court did not err in giving it to the jury.

Moreover, the trial court instructed the jury that not all of the instructions were applicable, depending on its findings about the facts of the case. The prosecutor emphasized the trial court's instruction that not all instructions would necessarily apply. We presume the jury would follow the instructions and disregard the pretextual self-defense instruction if it did not find the facts supported it. (*See People v. Sanchez* (2001) 26 Cal.4th 834, 852.) It did not, as defendant contends, impair the other self-defense instructions, which required the People to disprove both the perfect and imperfect self-defense theories. (*See People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381 [construing similar instruction, but rejecting claim that it "might have kept the jury from evaluating [the] self-defense claim"].) This instruction did not negate or weaken those instructions, nor did the prosecutor's argument.

*King*, 2015 WL 3417430, at *2–3. Petitioner raised this claim in a petition for review to the California Supreme Court (Lodg. Doc. No. 12) which was summarily denied. Lodg. Doc. No. 13.

            C.     Analysis

The court finds this instructional claim also fails. As respondent correctly notes in his answer, whether a particular factual scenario precludes a theory of self-defense under state law is a question which this court cannot review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). And, in any event, as the court of appeal noted, the jurors were also instructed to disregard any instructions that they determined to be inapplicable. *See* Lodg. Doc. No. 1 (Clerk's Transcript on Appeal) at 208-09. It is presumed, absent evidence to the contrary, that jurors follow the instructions they are given. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

            III.     Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective in failing to object to: (1) the trial court's pretextual self-defense instruction; and (2) the omission of an instruction on provocation as it pertains to premeditation and deliberation.

A.    Applicable Legal Standards

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687-88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

B.    State Court Decision

The California court of appeal did not weigh whether counsel was ineffective with respect to the self-defense instruction and, as noted *supra*, elected to address the merits of that claim despite counsel's failure to object.  With respect to the provocation instruction, the court of appeal held:

> Defendant contends the trial court improperly failed to instruct on provocation as it pertained to premeditation and deliberation, again proffering various reasons why the lack of an objection in the trial court should be excused. We decline to excuse the failure to object and find the claim forfeited.
>
> The trial court gave a voluntary manslaughter instruction (CALCRIM No. 570), premised on a sudden quarrel or heat of passion. The instruction defined provocation and required the People to prove beyond a reasonable doubt that defendant did not kill in the heat of passion, and if they did not, the jury was instructed to find defendant not guilty of murder. However, the jury was not instructed that provocation could also lessen a murder from first degree murder to second degree murder, by negating premeditation or deliberation or both. (*See*, *e.g.*, CALCRIM No. 522.)

As for provocation and heat of passion, the prosecutor argued defendant provoked Griffin, who was merely walking up the driveway with his motorcycle. Defendant's act of grabbing the rifle and confronting Griffin was not an objectively reasonable response to anything Griffin did. Defense counsel argued defendant became afraid when Griffin lunged at him suddenly, which qualified as a sudden quarrel for purposes of provocation.

CALCRIM No. 522 or similar instructions on provocation as it may bear on the questions of premeditation and deliberation are not necessary to the jury's understanding of the applicable law; such instructions merely "pinpoint" one fact—provocation—that may be emphasized by the defense to parry the prosecution's evidence about a defendant's intent, specifically, the mental states of premeditation and deliberation. Accordingly, such instruction must be requested by the defense in the trial court. (*See People v. Rogers* (2006) 39 Cal.4th 826, 877–880 [addressing CALJIC No. 8.73]; *People v. Middleton* (1997) 52 Cal.App.4th 19, 28–33, disapproved on another point by *People v. Gonzalez* (2003) 31 Cal.4th 745, 752–753, fn. 3.) Defendant cites no authority supporting his proposition that if some provocation instructions are given, all provocation instructions must be given. As we have just described, precedent holds that not all such instructions are necessary for the jury to understand the case.

Defendant points to an appellate decision holding such instruction is a pinpoint instruction, *People v. Lee* (1994) 28 Cal.App.4th 1724, at pages 1732 to 1734, and urges us not to follow it. But the opening brief does not address the holding of *People v. Rogers*, *supra*, 39 Cal.4th 826, and we may not depart from Supreme Court precedent. (*See Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In the reply brief, defendant notes that *Rogers* and other cases interpreted CALJIC No. 8.73, not CALCRIM No. 552. We see no material difference. Although CALCRIM No. 552 addresses both murder and manslaughter and the different degrees of murder, whereas CALJIC No. 8.73 addresses only the latter, in this case, the jury was instructed on the former via CALCRIM No. 570. The only principle of law it did not receive instruction on was that provocation can affect the degree of murder, by negating premeditation or deliberation, a pinpoint instruction that was not requested by the defense in the trial court as required.

Nor, on this record, can defendant bypass this procedural hurdle by invoking ineffectiveness of trial counsel. Defendant's trial counsel largely emphasized the accident defense supported by defendant's testimony. That was a rational tactical reason for not quibbling about provocation. (*See People v. Dennis* (1998) 17 Cal.4th 468, 527 ["defense counsel reasonably could decide to forgo the [pinpoint] instruction for tactical reasons"].)

*King*, 2015 WL 3417430, at *3–4. Petitioner raised this claim in a petition for review to the

California Supreme Court (Lodg. Doc. No. 12) which was summarily denied. Lodg. Doc. No. 13.

C.    Analysis

Petitioner's ineffective assistance claims are unavailing.  With respect to the self-defense instruction, the court of appeal rejected this claim on its merits.  As noted *supra*, this court has already concluded that petitioner is not entitled to federal habeas relief on this claim.  It is well settled that the failure to raise a non-meritorious argument does not constitute ineffective assistance of counsel.  *See Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982); *see also Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989).

As to the provocation instruction, the court of appeal found that there was a "rational tactical reason" for not emphasizing provocation - namely that petitioner's trial defense was premised on the theory that the shot that killed the victim was an accident.  This point finds support in the record.  In his closing argument, petitioner's trial counsel cast the incident as a tragic accident and emphasized that petitioner never intended to kill his uncle.  Lodg. Doc. No. 5 (Reporter's Transcript Vol. II) at 1007-08.  Thus, the court finds that the court of appeal's rejection of this ineffective assistance claim was not unreasonable.  *See Clabourne v. Lewis*, 64 F.3d 1373, 1382-83 (9th Cir.1995) (analyzing failure to request jury instruction as tactical decision by counsel); *see also Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir.1987), vacated on other grounds, 486 U.S. 1051 (1988), ("The decision not to request a lesser included offense instruction falls within the wide range of reasonable professional representation.").

Accordingly, petitioner's ineffective assistance of counsel claims should be denied.

IV.    Insufficient Evidence

Petitioner argues that ballistics evidence supports his testimony that the victim attacked him.  This claim does not appear to have been exhausted before the state courts.  Regardless, it is without merit.  *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (unexhausted claim may be denied where "it is perfectly clear that the applicant does not raise even a colorable federal claim").

/////

/////

/////

20

## A. Applicable Legal Standards

In a federal habeas proceeding, a habeas petitioner challenging the sufficiency of the evidence may obtain relief only if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). If the record supports conflicting inferences, the court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

## B. Analysis

Petitioner offers no evidence - indeed no argument - that a rational trier of fact could not have found him guilty based on the evidence presented at trial. Rather, he simply points to evidence which supports his contention that the victim had moved to attack petitioner when he was shot. ECF No. 51 at 131- 138. All of the evidence he cites was before the jury, however, and it still determined that he was guilty. Petitioner's attempt to re-try his case by highlighting favorable evidence and attempting to contradict inferences drawn by the jury must be rejected.

## V. Prosecutorial Misconduct

Petitioner's final claim is that the prosecutor committed misconduct by "allowing her ambitions to exceed the evidence" and misleading the jury. *Id.* at 5. Respondent points out that this claim was never presented to the California Supreme Court. Regardless, the court will deny this claim on its merits. *See Cassett*, 406 F.3d at 624.

First, this claim as articulated in the current petition is insufficiently plead. Petitioner makes several broad conclusions concerning prosecutorial misconduct, but he has entirely failed to offer any supporting argument or record citations. It is well settled that "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

Second, this claim would fail even if it were construed to be identical to the ones raised in a previous state habeas petition. In his state habeas petition, petitioner alleged that the prosecutor processed the murder weapon "backwards" in order to eliminate DNA evidence. Lodg. Doc. No.

/////

14 (State Habeas Corpus Petition).[5]  He also alleged that, by way of a PowerPoint presentation,

the prosecutor presented misleading information to the jury.  *Id.*  The superior court rejected these

claims:

> Petitioner contends that the prosecutor engaged in misconduct by presenting the jury with a misleading PowerPoint presentation. Petitioner does not specify what was stated in the PowerPoint and how it was erroneous nor does the attached excerpt from the trial transcript help discern what mistake, if any, was made.  Again, the petitioner carries the burden to articulate with particularity, the facts justifying relief.  In addition, a claim of prosecutorial misconduct requires a showing that the result in the case would have been different without the prosecutor's actions.  (*People v. Prysock* (1982) 127 Cal. App. 3d 972, 998.)  Here, the petition alleges that the judge stopped the trial to openly admonish the prosecutor for failing to change her PowerPoint and that she agreed to change it verbally. Even assuming that there was a mistake on the PowerPoint, it appears it was addressed and the jury was ultimately given the correct information.  As such, Petitioner has not shown that he is entitled to relief on this claim.

> Petitioner also argues that the prosecutor violated his due process rights by requesting the firearm be processed for fingerprints first, which may have eliminated DNA evidence on the weapon that could have brought forth other suspects or raised reasonable doubt.

> . . .

> In this case, Petitioner has not shown that processing the gun in this manner was incorrect, much less a violation of due process rights. More importantly, he has failed to show how this purported tampered evidence and his attorney's failure to file a motion to suppress affected the outcome of his trial.  There was no question as to who shot the victim.  Petitioner took the stand in his own defense and admitted to the shooting.  The only question was whether the shooting was an accident or intentional.  As such, any DNA evidence from the weapon was unlikely to have changed the results of this trial.

Lodg. Doc. No. 15 (Order Denying State Habeas Petition) at 2.  The superior court's

determination that the prosecutor's actions did not substantially impact the verdict was

reasonable.  *See Karis v. Calderon*, 283 F.3d 1117, 1128 (9th Cir. 2002) (stating that a claim of

prosecutorial misconduct is analyzed under the standard set forth in *Brecht v. Abrahamson,* 507

---

[5] The pagination in this document is sporadic.  The claim in question appears near the end of the lodged document on a non-numbered page.

U.S. 619 (1993)).[6] Petitioner himself admitted that the trial judge admonished the prosecutor and that the jury was given the correct information. And, as noted *supra*, petitioner's theory of the case was that the gun *he was holding* had discharged accidentally and killed his uncle. Thus, it is entirely unclear how properly testing the weapon for DNA would have substantially changed the trial's outcome.

<u>CONCLUSION</u>

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus (ECF No. 51) be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: February 5, 2019.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[6] The relevant test under Brecht is whether the action complained of "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.